Lopez, J.
Plaintiff moves pursuant to Mass.R.Civ.P. 26(c) for an order to bar defendants from inquiring into her immigration status. Defendants oppose the motion, contending that plaintiffs immigration status is relevant to the issue of damages. For the following reasons, plaintiffs motion is ALLOWED in part and DENIED in part.
BACKGROUND
On October 15, 1996, plaintiff Miriam Urrea (“Urrea”) filed a sexual harassment complaint under G.L.c. 15IB with the Massachusetts Commission Against Discrimination (“MCAD”). Urrea filed the complaint against her former employer, New England Tea and Coffee Co., Inc., New England’s Vice President, John Kaloyanides, and Urrea’s supervisor at the time, Badr-Eddine Zahir (collectively “New England”). Urrea alleges that beginning in September 1995, Zahir subjected her to unwanted sexual demands, and that her resistance to his advances resulted in threats and intimidation. In response to her complaint, New England contends that they took remedial steps to solve her problems, including transferring Urrea to a different shift, supervised by a different New England employee. On September 23, 1996, Urrea stopped working at New England Coffee.
The facts relevant to Urrea’s motion for a protective order are as follows: Urrea, a native of Colombia, was employed by New England as a coffee packer from November 1991 until September 1996. At the time New England hired Urrea, she completed the requisite 1-9 documentation and presented a valid work authorization card with an expiration date of August 13, 1992. During the course of discovery, New England claims to have received statements from witnesses that Urrea has served as an informant to the Immigration and Naturalization Service (“INS”) reportedly to *572 avoid deportation due to her illegal entry into the U.S. during the 1980s.
Procedurally, the court issued a Protective Order on November 23, 1999, allowing the parties to designate documents and portions of deposition testimony as relating to confidential information. On November 14, 2000, New England began deposing Urrea. Urrea’s attorney had previously instructed her not to respond at the deposition to questions about her immigration and work authorization status. Accordingly, the deposition was not fruitful, and on February 18, 2000, New England served a Request for Production of Documents, including all documents from 1985 to the present pertaining to Urrea’s eligibility for employment in the United States, and all documents that she has used in the past stating a different name or social security number. Urrea did not respond to those requests. On March 10, 2000, New England resumed Urrea’s deposition. When New England again began asking Urrea about her immigration status and other interactions with the INS, she again refused to answer, on the advice of her counsel. Urrea followed with the present motion on June 16, 2000, seeking a protective order barring inquiry into her immigration status or her relations with the INS.
DISCUSSION
Protective orders are governed by Mass.R.Civ.P. 26(c). Under the rule, a showing of “good cause” must be made for issuance of an order which "justice requires to protect a party or person from annoyance, embarrassment, oppression, or undue burden or expense.” Mass.R.Civ.P. 26(c). Urrea contends that as a matter of public policy, New England should be prohibited from harassing and intimidating her by using the discovery process to delve into issues irrelevant to her sexual harassment claim. In opposition, New England argues that Urrea’s immigration and work authorization status are directly relevant to its potential damages, and to Urrea’s ability to seek and maintain other employment following her departure from New England.
Both parties’ briefs discuss at length federal law regarding an undocumented alien’s right to collect back and front pay in actions arising under the National Labor Relations Act. Specifically, their arguments center around the Supreme Court’s holding in Sure-Tan, Inc. v. NLRB, 476 U.S. 883, 890 (1984), decided prior to the enactment of Immigration Reform and Control Act of 1986 (“IRCA”), which amended the Immigration and Nationality Act (“INA”) and among other things, made it illegal to employ undocumented aliens. 8 U.S.C.A. § 1324(a). In Sure-Tan, the Court held that the National Labor Relations Act protects undocumented aliens against unfair labor practices committed by their employer, who had reported them to the INS in retaliation for their engaging in union activities. As a result, the workers fled the United States. Id. at 890. The Supreme Court in Sure-Tan also held that in order to comply with the INS, remedial offers of reinstatement must be conditioned on the employee’s legal reentry into the United States, and employees must be deemed “unavailable” for work during any period when they were not lawfully entitled to be present and employed in the United States. Id. at 901. Hence, the Supreme Court’s decision in Sure-Tan limits the back pay that an undocumented alien employee may recover for violations of the National Labor Relations Act. See also I.N.S. v. Lopez-Mendoza, 468 U.S. 1032, 1047 n.4 (1984) (“while he maintains the status of an illegal alien, the employee is plainly not entitled to the prospective relief — reinstatement and continued employment — that probably would be granted to other victims of similar unfair labor practices”).
The circuit courts that have addressed the issue of back pay and undocumented aliens in actions arising under Title VII and the National Labor Relations Act since the IRCA’s enactment have split in their application and interpretation of Sure-Tan. The Fourth and Seventh circuits have strictly interpreted Sure Tan and the IRCA to prohibit awarding any back pay to an undocumented worker. See Del Ray Tortilleria, Inc. v. NLRB, 976 F.2d 1115, 1121-22 (7th Cir. 1992) (under the IRCA’s enactment, the NLRB is barred from awarding back pay to undocumented aliens discharged after 1986); Egbunga v. Time-Life Libraries, Inc., 153 F.3d 184 (4th Cir. 1998) (IRCA makes clear that an alien is entitled to reinstatement and back pay by proving formal authorization for employment in the United States at the time in question, not merely by being capable of performing the job). The Second, Ninth, and District of Columbia circuits, on the other hand, have allowed some recovery. See Hoffman Plastics Compounds v. NLRB, 208 F.3d 229 (D.C. Cir. 2000), vacated 2000 U.S. App. LEXIS 15647 (proper to deny an undocumented worker’s reinstatement and limited his back pay to the period beginning with the unlawful termination and ending on the date the employer learned of the undocumented status); see also NLRB V.A.P.R.A. Fuel Oil Buyers Group Inc., 134 F.3d 50 (2nd Cir. 1997) (undocumented workers remaining in the United States are eligible for back pay as of the time of the violation until they legally qualify for future employment); EEOC v. Hacienda Hotel, 881 F.2d 1504 (9th Cir. 1989) (under Title VII, undocumented workers not subject to deportation proceedings remained available for employment, and therefore were entitled to back pay awards). Thus, the law is unsettled regarding an undocumented alien’s ability to collect front or back pay under federal labor laws.
Suffice to say, it is not clear if any of these rules might apply to a case under G.L.c. 151B. Accordingly, since the relevance of Urrea’s immigration status may turn on a highly disputed and difficult point of law, it would be improper to decide at the discovery stage whether c. 15 IB allows for undocumented workers to recover back pay. See Aschheim Co., Inc., v. Turkanis, *573 17 Mass.App.Ct. 901, 968 (1983). The court also deems It more efficient to proceed with discovery on this issue now, to dispense with the need to engage in a second discovery process at later date. Thus, the issue presented on Urr'ea’s motion for a protective order reduces to whether New England has made a minimal showing warranting the discovery of Urrea’s immigration status. See E.A. Miller, Inc., v. South Shore Bank, 405 Mass. 95, 101 (1989) (holding that litigants may be denied an opportunity for discovery if their complaints and affidavits have “not made even a minimal showing warranting the requested discovery”).
“Mutual knowledge of all the relevant facts gathered by both parties is essential to proper litigation.” Atlas Truck Corp. v. Donabed, 47 Mass.App.Ct. 221 (1999). Discovery is not limited to issues raised by the pleadings, nor to the merits of the case, for discovery itself helps to define and clarify these disputed issues. See Cronin v. Strayer, 392 Mass. 525, 534 (1984). Although the Rules of Civil Procedure aim for the broadest scope in discovery, they also contemplate occasions where restrictions on the flow of information may be necessary. Mass.R.Civ.P. 26, Mass Practice. Under Mass.R.Civ.P. 26(c), therefore, a showing of “good cause” can lead to the issuance of an order which “justice requires to protect a party or person from annoyance, embarrassment, oppression, or undue burden or expense.” Mass.R.Civ.P. 26(c). Specifically, while a trial judge enjoys broad discretion in deciding to grant a protective order, see Hudson v. Commissioner of Correction, 46 Mass.App.Ct. 538, 549 (1999), one must be particularly sensitive “to preventing exposure for the sake of exposure,” In the Matter of Roche, 381 Mass. 624, 636, and must therefore consider (1) whether the proposed discovery proceeds from harassment or revenge; (2) whether the discovery may impose any particular hardship; and (3) whether discovery is efficient and economical. Id. at 637; see also James W. Smith & Hiller B. Zobel, Rules Practice, §26.7, at 39 (1995 ed. & Supp. 2000).
The foregoing discussion demonstrates that Urrea’s immigration status is relevant because it pertains to her ability to recover back pay and to obtain a comparable job.[2] Conway v. Electro Switch Corp., 402 Mass. 385, 389 (1988). Urrea has a duty to mitigate damages by seeking other employment, see id. at 389 (1988), but New England bears the burden of proof on mitigation at trial. See Buckley Nursing Home, Inc. v. Massachusetts Com’n Against Discrimination, 20 Mass.App.Ct. 172, 185 (1985). New England’s burden is satisfied on a showing that “(a) one or more discoverable opportunities for comparable employment were available in a location as convenient as the place of former employment; (b) the improperly discharged employee unreasonably made no attempt to apply for any such job, and (c) it was reasonably likely that the former employee would obtain one of those comparable jobs." Id. Thus, New England is entitled to know whether Urrea’s immigration status hindered her ability to obtain a job of comparable worth.
Accordingly, the Court now rules that Urrea must disclose her immigration status during the period in which she was employed at New England Tea until the date of her MCAD hearing. To fashion Urrea’s protective order, the Court adopts the MCAD’s formula for back pay.[3] This time period provides a workable solution; should Urrea prevail in her suit, New England will be liable for back pay damages up until the date of her MCAD hearing, subject to mitigation. As previously stated, Urrea’s immigration status during her tenure at New England may also be relevant to her overall ability to collect any back pay awarded.
This disclosure will cause Urrea little hardship. If, as she alleges, New England knew that Urrea’s permit expired on August 13, 1997, then New England was aware of the information she now seeks to conceal. Moreover, the Protective Order issued by the court on November 23, 1999, provides Urrea with the option to designate her deposition or portions thereof as “Confidential,” thereby preventing it from being “disclosed or used for any purposes whatsoever other than mediation, conciliation, negotiation, settlement, or trial preparation” and from being “divulged to any person other than the parties, the attorneys” without certain precautionary steps taken. Hence, this procedure ensures sensitivity should Urrea reveal that during the period in question, she was an illegal alien.
In sum, although Urrea’s alien status has no bearing on her ability to bring her 15 IB claim, because it may impact her ability to collect damages, her immigration status between the date of employment at New England Coffee and the date of her MCAD hearing is relevant and discoverable. See Cronin, 392 Mass. at 534 (the relevance of discovery documents and requests should be “defined broadly to encompass any matter that bears on, or that reasonably could lead to other matter that could bear on, any issue that is or may be in the case”). Thus, Urrea’s motion for a protective order is ALLOWED in part and DENIED in part.
ORDER
For the foregoing reasons, plaintiffs motion for a protective order is ALLOWED in part and DENIED in part. Defendants are prohibited from inquiring about plaintiffs immigration status during the years prior the date she was hired by defendants in 1991, and are prohibited from inquiring into her status after October 15, 1996.

Urrea has provided New England with some information regarding her employment history since 1996. However, the information provided so far contains gaps in employment, and in at least one instance, only generalized dates of employment.

There is no Massachusetts appellate authority that indicates the manner in which back pay must be computed under *574 G.L.c. 151B. The federal courts have not adopted a single method for calculating a back pay award, and under Title VII, have articulated a number of possible dates on which back pay liability might terminate. See Robert Belton, Remedies in Employment Discrimination Law, §§9.26-9.28 (1992). With the exception of punitive damages, front pay. Injunctive relief and attorneys fees, the judicial remedies available in a court action brought under c. 15 IB are generally comparable to those available at the MCAD administrative hearing. Scott C. Moriearty, Adkins & Lipsitz, Employment Law §8.58, at 413 (1995). The MCAD calculates back pay in a constructive discharge case from the date of termination until the hearing date. See Sileikias v. American Inventors Corp., 13 Mass.Discrim.L.Rep. 1519, 1609-11 (1991); Moriearty at §8.52 at 406; Conway, 402 Mass. at 388-89 (1988) (cautioning that “damages may not be determined by speculation or guess”).